S10G0448. NUCI PHILLIPS MEMORIAL FOUNDATION, INC.
v. ATHENS-CLARKE COUNTY BOARD OF TAX ASSESSORS.
(703 SE2d 648)

CARLEY, Presiding Justice.

Linda Phillips established the Nuci Phillips Memorial Foundation, Inc. in honor of her son, Nuci Phillips, a talented young musician who suffered from depression, which ultimately led to his suicide while he was a student at the University of Georgia. The Foundation owns and operates a facility called Nuci's Space, which provides a healthy, safe place for the Athens community where musicians and others may come to seek help for anxiety, depression or other emotional disorders. The Foundation applied for an exemption from ad valorem taxation for the property on which its facility is located, and the exemption was granted by the Athens-Clarke County Board of Equalization. The Athens-Clarke County Board of Tax Assessors (Board) challenged the grant of exemption in the trial court, which affirmed the exemption. The Board appealed from the trial court's ruling to the Court of Appeals, which reversed in *Athens-Clarke County Bd. of Tax Assessors v. Nuci Phillips Memorial Foundation*, 300 Ga. App. 754 (686 SE2d 371) (2009). The Court of Appeals found that since the Foundation rents out rehearsal space as well as space for private birthday parties and wedding receptions, then the Foundation does not use its property exclusively in furtherance of its charitable pursuits as required by OCGA § 48-5-41 (d) (2) in order to qualify for an exemption from ad valorem taxation. *Athens-Clarke County Bd. of Tax Assessors v. Nuci Phillips Memorial Foundation*, supra at 755. We granted certiorari to consider whether the Court of Appeals erred in applying OCGA § 48-5-41 (d) (2).

1. "[W]hen we are interpreting a statute, we must presume that the General Assembly had full knowledge of the existing state of the law and enacted the statute with reference to it. [Cits.]" *Chase v. State*, 285 Ga. 693, 695 (2) (681 SE2d 116) (2009). Furthermore, when construing statutes, " 'their meaning and effect is to be determined in connection, not only with the common law and the constitution, but also with reference to other statutes and the decisions of the courts.' [Cit.]" *Chase v. State*, supra at 695-696 (2). Therefore, in order to discern the meaning and effect of the 2006 and 2007 amendments to OCGA § 48-5-41, we must look to the history of the statute and the decisions of the courts that have interpreted it.

The General Assembly, pursuant to the Georgia Constitution of 1877, exempted from ad valorem taxation the property of "all institutions of purely public charity . . . *provided*, the . . . property so exempted be not used for purposes of private or corporate profit or income." (Emphasis in original.) Ga. L. 1878-1879, pp. 32, 33, § 1. Thereafter, the decisions of this Court construed the statute as disallowing the use of exempted property from any type of private or corporate income-producing activity, whether the activity was charitable or non-charitable. *Mundy v. Van Hoose*, 104 Ga. 292, 299 (30 SE 783) (1898) (superseded by statute as stated in *Elder v. Henrietta Egleston Hosp. for Children*, 205 Ga. 489, 492 (53 SE2d 751) (1949)).

After passage of the Georgia Constitution of 1945, the General Assembly amended the above-quoted statute to allow exempt institutions to raise income as long as "any income from such property is used exclusively for religious, educational and charitable purposes, or . . . for the purpose of maintaining and operating such institution. . . ." Ga. L. 1946, pp. 12, 13, § 1 (a). In *York Rite Bodies of Freemasonry of Savannah v. Bd. of Equalization of Chatham County*, 261 Ga. 558 (2) (408 SE2d 699) (1991), this Court summarized the requirements for an institution to qualify as a "purely public charity" for an ad valorem tax exemption under the exemption statutes from 1946 to the pre-2006 exemption statute, OCGA § 48-5-41. "First, the owner must be an institution devoted entirely to charitable pursuits; second, the charitable pursuits of the owner must be for the benefit of the public; and third, the use of the property must be exclusively devoted to those charitable pursuits." *York Rite Bodies of Freemasonry of Savannah v. Bd. of Equalization of Chatham County*, supra. Under the exemption statutes from 1946 to 2006, those institutions that qualified as purely public charities were allowed to use their property to produce income as long as the primary purpose of the property was not to secure income, the income-producing activity was consistent with its charitable activities, and the income was used exclusively for the institution's charitable purposes. Former OCGA § 48-5-41 (a) (4), (c), (d). As long

as these three income rules were satisfied, then a charitable organization that raised income would be considered as using its property "exclusively" for its charitable purposes and thus remain a purely public charity. See *Fulton County Bd. of Tax Assessors v. Visiting Nurse Health System of Metropolitan Atlanta*, 256 Ga. App. 475, 477 (2) (b) (568 SE2d 798) (2002); *Chatham County Bd. of Tax Assessors v. Southside Communities Fire Protection*, 217 Ga. App. 361, 364-365 (457 SE2d 267) (1995). Compare *Rabun Gap-Nacoochee School v. Thomas*, 228 Ga. 231, 235, 241 (1) (a), (e), 245-246 (2) (c) (184 SE2d 824) (1971); *Cobb County Bd. of Tax Assessors v. Marietta Educational Garden Center*, 239 Ga. App. 740, 741, 745 (2) (521 SE2d 892) (2000).

In response to a referendum approved in November 2006, the General Assembly amended OCGA § 48-5-41 to add subsection (d) (2), which, according to its terms, applied only to institutions that qualify as "purely public charities" pursuant to OCGA § 48-5-41 (a) (4), and provided that

> real estate or buildings which are owned by a charitable institution that is exempt from taxation under Section 501 (c) (3) of the federal Internal Revenue Code and used by such charitable institution for the charitable purposes of such charitable institution may be used for the purpose of securing income so long as such income is used exclusively for the operation of that charitable institution.

Ga. L. 2006, pp. 376, 377, § 1. However, not long after this amendment was passed, the legislature further amended OCGA § 48-5-41 (d) (2) to state that

> a building which is owned by a charitable institution that is otherwise qualified as a purely public charity and that is exempt from taxation under Section 501 (c) (3) of the federal Internal Revenue Code and which building is used by such charitable institution exclusively for the charitable purposes of such charitable institution, and not more than 15 acres of land on which such building is located, may be used for the purpose of securing income so long as such income is used exclusively for the operation of that charitable institution.

Ga. L. 2007, p. 341, § 1.

According to the Board and the dissent, the amendments to OCGA § 48-5-41 (d) (2) in 2006 and 2007, more than 15 years after this Court's decision in *York Rite*, did not alter the requirements for

exemption of an institution that has qualified as a "purely public charity" under OCGA § 48-5-41 (a) (4) but also uses its property to produce income. However, this interpretation would render the amendments completely meaningless and would contravene the intent of the legislature and contradict basic principles of statutory construction. "All statutes are presumed to be enacted by the legislature with full knowledge of the existing condition of the law and with reference to it.' [Cit.]" *Inland Paperboard & Packaging v. Ga. Dept. of Revenue*, 274 Ga. App. 101, 104 (616 SE2d 873) (2005). Furthermore, "when a statute is amended, '"(f)rom the addition of words it may be presumed that the legislature intended some change in the existing law."'' [Cit.]" *Board of Assessors of Jefferson County v. McCoy Grain Exchange*, 234 Ga. App. 98, 100 (505 SE2d 832) (1998).

As a result of the added language in OCGA § 48-5-41 (d) (2), the only changes to the qualifications for exemption status for a charitable institution are that it must be designated a Section 501 (c) (3) organization under federal law, and any building and not more than 15 acres of land owned by the institution may now be used "for the purpose of securing income so long as such income is used exclusively for the operation of that charitable institution." Following the principles of statutory interpretation set out above, we must presume that the General Assembly had full knowledge that statutory law and case law has, for over sixty years, allowed charitable institutions to use their property to raise income as long as that income was raised by acts consistent with the charitable purpose of the institution and used exclusively for those charitable pursuits. See *Roberts v. Ravenwood Church of Wicca*, 249 Ga. 348, 353-354 (292 SE2d 657) (1982); *Church of God of the Union Assembly v. City of Dalton*, 216 Ga. 659, 662 (119 SE2d 11) (1961); *Peachtree on Peachtree Inn v. Camp*, 120 Ga. App. 403, 410-411 (170 SE2d 709) (1969); *Central Bd. on Care of Jewish Aged v. Henson*, 120 Ga. App. 627, 630 (1) (171 SE2d 747) (1969). Furthermore, we must assume that by adding new language to the statute, the General Assembly intended to broaden the ability of charitable institutions to use their property to raise income. Therefore, the General Assembly must have intended to allow those institutions that otherwise qualify as a purely public charity to use their property to raise income from activities that are not necessarily charitable in nature so long as the "primary purpose" of the property was charitable and any "income is used exclusively for the operation of that charitable institution." OCGA § 48-5-41 (d) (1), (2).

The Board and the dissent apparently agree that the 2006 amendment would have allowed exempt charitable institutions to raise income from non-charitable activities, but believe that the

subsequent 2007 amendment returned the law to its pre-2006 form so as to restrict income-producing activities once more to only those that are consistent with the charitable purposes of the institution. The legislature did add language to OCGA § 48-5-41 (d) (2) when it passed the 2007 amendment, and, thus, the principle cited above that an addition of words should be presumed to effect a change of existing law seems to apply. However, this principle is a presumption of change only and may be rebutted by evidence that the legislature in fact did not intend a change. A reading of the preamble to the 2007 amendment clearly rebuts the presumption of change. See *Concerned Citizens of Willacoochee v. City of Willacooche*, 285 Ga. 625, 626 (680 SE2d 846) (2009) (pointing to language in preamble to buttress conclusion that amendment did not intend to change previous law). The preamble specifically states that the 2007 amendment is "to clarify an ad valorem tax exemption for certain charitable institutions." Ga. L. 2007, p. 341. To "clarify" something means "to explain clearly: make understandable," as opposed to effecting a "change," which means "to make different." *Webster's New Third International Dictionary* 373, 415 (3rd ed. 1966). Therefore, when it passed the 2007 amendment, the General Assembly did not intend a change to the effect of OCGA § 48-5-41 (d) (2), but only sought to make clear that, in order to be granted an exemption, any charitable institution must be "otherwise qualified as a purely public charity," which includes meeting the requirement of *York Rite* that the property be used "exclusively" for the charitable pursuits of the institution. The conclusion that the 2007 amendment did not effect a change to existing law is further supported by the fact that a charitable institution, even before the 2007 amendment, had to qualify as a purely public charity under OCGA § 48-5-41 (a) (4) because, according to its terms, OCGA § 48-5-41 (d) (2) would not even apply unless the former provision was first satisfied. Moreover, the 2006 amendment to OCGA § 48-5-41 added a new subsection (d) (2). However, although the 2007 amendment added language to (d) (2), it did not delete this subsection. Therefore, if the General Assembly intended to return the law to its pre-2006 form, it could have just deleted (d) (2) in its entirety in order to effectuate that purpose. However, the General Assembly kept (d) (2) and, therefore, we can presume that it intended to retain the effect of the 2006 amendment, but clarify its application.

By emphasizing in the 2007 amendment the previous qualifications for a "purely public charity," including that the property must be used "exclusively" for the charitable purposes of the institution, the General Assembly sought to clarify that the tax exemption continues to be unavailable to certain charitable institutions. First, an exemption is still unavailable in those situations where a public

charity owns property, but does not use the property in its charitable purposes. See *Thomas v. Northeast Ga. Council, Inc., Boy Scouts of America*, 241 Ga. 291, 293 (244 SE2d 842) (1978) ("Mere latent ownership of property by an institution of public charity will not entitle it to an exemption. . . ."). Second, certain institutions are not allowed to qualify for the exemption even though substantial charitable activity takes place on the property if the property is not used exclusively for charitable purposes. See *Board of Equalization v. York Rite Bodies of Freemasonry of Savannah*, 209 Ga. App. 359, 360 (433 SE2d 299) (1993) (denying exemption to a Masonic lodge because it also devoted numerous resources to pursuits that benefitted only its members).

Finally, the Board argues that allowing an institution that otherwise qualifies as a purely public charity to raise income from non-charitable activities, including rental of property, would lead to a greatly expanded tax exemption and would be vulnerable to abuse by commercial developers wishing to evade property tax. However, even though we conclude that OCGA § 48-5-41 (d) (2) allows charitable institutions to raise income from non-charitable activities, including the rental of property, we also note that all previous requirements for qualifying as a purely public charity under OCGA § 48-5-41 (a) (4) still apply, including OCGA § 48-5-41 (d) (1), which states that the tax exemption "shall not apply to real estate or buildings which are rented, leased, or otherwise used for the primary purpose of securing an income thereon." Therefore, a commercial developer could not abuse subsection (d) (2) by qualifying for the exemption even though a charitable purpose is only an incidental use of the property, because the primary use of that property would be commercial and thus disqualify it from the exemption under subsection (d) (1). Furthermore, OCGA § 48-5-41 (c) prohibits the use of exempt property to raise income distributable to shareholders or other owners of the property, which severely restricts any profit-making from the property by a corporation or individual. Finally, we emphasize that " 'the facts of each case must be viewed as a whole and all of the circumstances surrounding the institution must be considered. (Cits.)' [Cit.]" *Chatham County Bd. of Tax Assessors v. Southside Communities Fire Protection*, supra at 363.

2. To summarize, in order for an institution to be granted a property tax exemption pursuant to OCGA § 48-5-41 (a) (4), it must satisfy the *York Rite* factors and OCGA § 48-5-41 (c), (d) (1) and (2).

As to the *York Rite* factors, the property owned by the Foundation is devoted entirely to charitable purposes. The building provides a safe haven for musicians, or others, who are coping with mental illness. The Foundation conducts a referral program whereby

trained staff are available to assist those with mental disorders and refer them to the appropriate health care facilities, and will pay for this care if the patient is in need of funds. The activities cited by the Board, such as rehearsal space and party rentals, are an incidental use of the property and have the sole purpose of raising funds to be used for the organization's charitable services. As long as the service of people who do pay is not the primary purpose of the institution, then the institution can be said to be purely charitable. *Fulton County Bd. of Tax Assessors v. Visiting Nurse Health System of Metropolitan Atlanta*, supra at 476 (2) (b).

The charitable purposes of the Foundation are for the benefit of the public. Help is available to all who walk through the door. Although the Foundation works primarily with musicians and artists, anyone who seeks help is assisted. Moreover, "to qualify as public it is not necessary that the home be open to the entire public. It is sufficient that it be open to the classes for whose relief it was intended. [Cits.]" *Central Bd. on Care of Jewish Aged v. Henson*, supra at 629-630 (1). The Foundation's use of its property is exclusively devoted to its charitable purpose of providing a safe environment as well as assistance to those suffering from mental illness. Most activities that take place on the property, such as the professional counseling assistance program, the provision of group meeting space for Survivors of Suicide and other groups, and the career resources board, are at the core of the organization's charitable purposes. In light of the 2007 amendment to OCGA § 48-5-41 (d) (2), any non-charitable activities, such as party and rehearsal rentals, which have the sole purpose of raising income to be utilized in furtherance of the organization's charitable purposes, now qualify as activities exclusively devoted to the institution's charitable pursuits. Therefore, the Foundation qualifies as a "purely public charity" under the *York Rite* factors.

The Foundation is not disqualified from the tax exemption under the restrictions in OCGA § 48-5-41 (c) and (d) (1). The institution issues no stock, makes no profit, does not distribute any dividends or any income to members, accumulates no retained earnings, and has a Board of Directors whose members serve without compensation. Although the organization periodically rents out part of its building to third parties, the primary purpose of the building is not to raise income but to provide services for those seeking mental health assistance. Any income raised is incidental to the primary use of the property, and the purpose of raising the income is to help fund the organization's charitable services, including the payment for direct professional therapy for those who cannot afford it. See *Roberts v. Ravenwood Church of Wicca*, supra. Moreover, OCGA § 48-5-41 (d) (1) prefaces its restrictions with the phrase "[e]xcept as otherwise

provided in [(d)] (2)," which we have already shown permits the securing of income by non-charitable activities if used exclusively for the operation of the charitable institution. The building is solely used for the provision of charitable services, and it is undisputed that no donor receives part of any income from the property.

Finally, the Foundation fulfills the requirements of OCGA § 48-5-41 (d) (2). As discussed above, the organization qualifies as a purely public charity, and there is no dispute that it is exempt from federal taxation as a Section 501 (c) (3) charity. The second prong of subsection (d) (2) is the same as the third prong of *York Rite*, which we have already established is satisfied in this case. Finally, the Foundation has provided evidence that all income obtained from the property is used in furtherance of its charitable services or to offset expenses incurred in the maintenance of the organization's property, and "no part of its income [is] being distributed to any person with an interest therein." *Peachtree on Peachtree Inn v. Camp*, supra.

The Foundation has established that it qualifies as a purely public charity pursuant to OCGA § 48-5-41 (a) (4) and fulfills the requirements in OCGA § 48-5-41 (c), (d) (1) and (2). Therefore, the trial court correctly affirmed the decision of the Athens-Clarke County Board of Equalization to grant the Foundation an exemption from ad valorem taxation, and the Court of Appeals erred in reversing the ruling of the trial court.

*Judgment reversed. All the Justices concur, except Melton and Nahmias, JJ., who concur specially and Hunstein, C. J., Benham and Hines, JJ., who dissent.*

NAHMIAS, Justice, concurring specially.

In my view, Presiding Justice Carley's plurality opinion reaches the correct result in this difficult tax exemption case, but its reasoning improperly limits the expanded exemption for property of purely public charities that the people of Georgia endorsed in a 2006 referendum and the General Assembly codified in OCGA § 48-5-41 (d) (2) in 2006 and 2007. I believe that Chief Justice Hunstein's dissent is even more improperly restrictive, as it misreads the code not only to nullify the recent amendments but those enacted in 1946 as well.

I write separately now to explain my interpretation of this complex statute, about which I have somewhat more confidence after reviewing the motion for reconsideration, but also to explain that I see the plurality opinion as governing the outcome of future cases raising this issue, which may affect many charities throughout the state. Thus, if the General Assembly wishes to have what I believe was the purpose of the 2006 and 2007 amendments recognized by this Court as the law, the Legislature will need to amend OCGA §

48-5-41 (d) again to make its meaning crystal clear.

Fundamental to my view is the understanding that virtually all activities that produce income — such as the sale or rental of property, goods, or services — are not themselves "charitable," but instead compete with the sale or rental of similar property, goods, or services for non-charitable purposes. As explained further below, Georgia law has never distinguished between "charitable" and "non-charitable" income-producing activities or looked to whether income-producing activities were sufficiently "charitable," because those are not real distinctions; I respectfully submit that this is the basic defect in the reasoning of both the plurality and the dissenting opinions.

However, since 1946 our law has recognized that income-producing activities are consistent with "charitable pursuits" when all of the income is then returned to the charitable institution to be used to further its charitable purposes and operations. Thus, for more than a half-century now, the General Assembly has authorized an ad valorem tax exemption for charities that use their property to generate income, with restrictions to limit the extent of such property use and to ensure that the income is not diverted for private profit. The 2006 and 2007 amendments to OCGA § 48-5-41 (d) further expended this authorization, and that policy decision by the Legislature — which was based on a statewide referendum approved by the people of Georgia — should not now be improperly restricted by this Court.

*1. The Law from 1878 to 1946*

For well over a century, Georgia law has exempted from ad valorem taxation the property of "institutions of purely public charity." Ga. L. 1878-1879, pp. 32, 33, § 1. However, the December 1878 statute also required that "property so exempted be not used for the purposes of private or corporate profit or income." Id. The statute reflected a policy judgment that tax-exempt institutions should not be allowed to compete with tax-paying businesses to any extent.

This Court's decision in *Mundy v. Van Hoose*, 104 Ga. 292 (30 SE 783) (1898), illustrates the correct understanding of the non-charitable nature of income production generally as well as the applicable law during this period. *Mundy* involved the Georgia Female Seminary, an institution that used its property for the education of girls. See id. at 292, 301. The school was open to all girls who wished to attend, with no one turned away because of inability to pay, but it charged those who could afford to pay for tuition, board, uniforms, and entertainment. See id. at 293-294, 301. These charges constituted income from the use of the property, and even though the income was then used to pay the expenses of the school, it was no

different in kind than the income produced by a non-charitable school or by any other seller of uniforms or musical performances. Thus, under the 1878 statute, the school did not qualify for the tax exemption. See id. at 300-301.

The Court explained:

> "Property used to produce income to be expended in charity is too remote from the ultimate charitable object to be exempt. If property is allowed to be used as taxed property, it also is to be taxed. If it competes in the common business and occupations of life with the property of other owners, it must bear the tax which theirs bears. Thus, if even a synagogue or a church were rented out during the week for a storeroom or a shop, though divine service might be performed in it on Saturday or Sunday, and though the rents were all appropriated to religious or charitable uses, its exemption would be lost."

Id. at 297-298 (quoting *Trustees of the Academy of Richmond County v. Bohler*, 80 Ga. 159, 164 (7 SE 633) (1887)).

*2. The Law from 1946 to 2006*

While highly protective of tax-paying competitors, the policy codified in the 1878 law effectively limits charities to obtaining their operating funds solely from donations and significantly limits how charitable institutions may use their property. As *Mundy* holds, a charity's property would not be tax-exempt even if the charity charged those using it only if they could afford to pay and used the proceeds to help even more people who cannot pay for what the charity provides — thereby increasing the total amount of charity provided. The balance between the pro-competition policy and the pro-charity policy was shifted by the Georgia Constitution of 1945, see Ga. Const. of 1945, Art. VII, Sec. I, Par. IV, and the passage in 1946 of an amendment revising the charitable tax exemption law to track the language of the new constitutional provision. The revised law now allowed exempt charitable institutions to use their property to produce income, although still with significant restrictions.

The first set of restrictions prevented property owned by charities from being used to generate income that was diverted for private gain; these restrictions remain essentially unchanged today. See Ga. L. 1946, pp. 12, 13, § 1 (a), now codified with minor revisions as OCGA § 48-5-41 (c). Thus, private property owned by charities "shall not be used for the purpose of producing private or corporate profit and income distributable to shareholders in corporations owning such property or to other owners of such property." Id. But the text regarding income production did not stop there, as it did in the 1878

statute. Instead, the 1946 amendment now authorized charities to use their property to produce income, with the important limitation that "any income from such property is used exclusively for religious, educational and charitable purposes, ... and for the purpose of maintaining and operating such institution." Ga. L. 1946, p. 13, § 1 (a). This was a fundamental change, which recognized that activities producing income can qualify as a "charitable pursuit," not because the income-producing activity is itself "charitable" (it still is not), but because the use of the resulting income to further the purposes and operations of the charity benefits the public.

In addition, to seek a tax exemption, an institution like the Nuci Phillips Memorial Foundation, Inc. must qualify as a "purely public charity." OCGA § 48-5-41 (a) (4). This requires that the institution be devoted entirely to charitable pursuits that benefit the public, in addition to satisfying the rules regarding the use of its property. See *York Rite Bodies of Freemasonry of Savannah v. Bd. of Equalization of Chatham County*, 261 Ga. 558, 558 (408 SE2d 699) (1991) (summarizing the test for a "purely public charity" as "[f]irst, the owner must be an institution devoted entirely to charitable pursuits; second, the charitable pursuits of the owner must be for the benefit of the public; and third, the use of the property must be exclusively devoted to those charitable pursuits").

Beyond the restrictions that ensured that the new authorization of income-producing activity would be utilized solely to increase the funds available for the charity's good works, the 1946 amendment limited the *extent* to which charitable property could be used to produce income. The tax exemption would *not* "apply to real estate or buildings ... which [are] rented, leased, or otherwise used *for the primary purpose* of securing an income thereon." Ga. L. 1946, p. 13, § 1 (a), codified with minor revisions as OCGA § 48-5-41 (d) until 2006 and now as OCGA § 48-5-41 (d) (1) (emphasis supplied). In sum, the 1945 Constitution and 1946 amendment changed the prior law to allow private charities to use their property to produce income that was then used exclusively for their charitable pursuits, and thereby to compete "in the common business and occupations of life with the property of other owners" who pay ad valorem taxes, *Mundy*, 104 Ga. at 298 — but only to a limited extent, as an incidental rather than primary purpose of the property.

In accordance with this new legal regime, this Court upheld tax exemptions for charitable institutions that used their property to produce a limited amount of income and satisfied the restrictions on how that income was then used. In the leading post-1946 case of *Elder v. Henrietta Egleston Hosp. for Children*, 205 Ga. 489 (53 SE2d 751) (1949), the charitable hospital was open to all patients but charged 31% of its patients for all of their medical care, 24% for part

of their care, and 45% for none of their care, using all of the income generated for the hospital's charitable purposes. See id. at 490-491. Acknowledging that the case would have been decided differently under the 1878 law and precedents like *Mundy*, the Court held that the hospital was entitled to a tax exemption under the 1946 statute. See id. at 491-493. Similarly, in *Church of God of the Union Assembly, Inc. v. City of Dalton*, 216 Ga. 659 (119 SE2d 11) (1961), we held that a restaurant located in the church building, which was used primarily to feed members of the church, visiting church personnel, and persons in need but also was open to paying customers, was tax-exempt. See id. at 660, 662.

On the other hand, under the 1946 law the tax exemption was denied where income production was clearly the primary purpose of the property — like where a medical facility required all patients to pay and only charged off as charity the bills that it was unable to collect, see *Georgia Osteopathic Hosp. v. Alford*, 217 Ga. 663, 668 (124 SE2d 402) (1962), and when a medical facility provided services only when paid and could deny services to the poor and needy, see *United Hospitals Service Assn. v. Fulton County*, 216 Ga. 30, 32-34 (114 SE2d 524) (1960). See also *Cobb County Bd. of Tax Assessors v. Marietta Educational Garden Center, Inc.*, 239 Ga. App. 740, 741, 745 (521 SE2d 892) (1999) (denying exemption not because the Garden Center generated income by charging membership dues and renting its facilities for social events, using the income to offset the center's expenses, but rather because the Center provided substantial benefits, including free use of the Center, only to dues-paying member clubs).

Notably, in reaching these holdings, the Court did not focus on whether the income-producing activity was itself "charitable" or whether the property was being used "exclusively" for a charitable purpose, as the plurality and dissent would respectively require. Providing medical care for compensation is a common business rather than an inherently "charitable activity," and charging 55% of patients at least partly for their care is not "exclusively" charitable. Likewise, selling food in a restaurant is an everyday business activity and not one directly related to the religious purposes of a church. But when these activities were conducted in the charity's building and when all of the income was returned to the charity to further its charitable purposes, this Court permitted the tax exemption, in accordance with the rules laid down by the General Assembly.

*3. The 2006 Referendum and the 2006 Amendment*

In the November 2006 statewide election, the following referendum question was presented to the people of Georgia:

Shall the Act be approved which grants an exemption from

ad valorem taxation on property owned by a charitable institution which generates income when that income is used exclusively for the operation of such charitable institution?

The question was answered "yes" by 68.5% of the voters.

This approval resulted in an amendment to OCGA § 48-5-41 (d), effective January 1, 2007. See Ga. L. 2006, p. 377, §§ 1, 2. The revised statute retained the existing OCGA § 48-5-41 (d) — the source of the "primary purpose" limitation on the use of charitable property to produce income — as subparagraph (d) (1), but with this new introductory phrase: "[e]xcept as otherwise provided in paragraph (2) of this subsection." The new subparagraph (d) (2) — the exception to the old subsection (d) — was the following:

With respect to paragraph (4) of subsection (a) of this Code section [which provides the tax exemption for institutions of "purely public charity"], real estate or buildings which are owned by a charitable institution that is exempt from taxation under Section 501 (c) (3) of the federal Internal Revenue Code and used by such charitable institution for the charitable purposes of such charitable institution may be used for the purpose of securing income so long as such income is used exclusively for the operation of that charitable institution.

Read in its legal and historical context, it is clear that the 2006 amendment and the referendum that allowed it to be enacted were meant to *expand* the tax exemption for a charity's property that is used to generate income for the charity. A referendum was not required to reduce or repeal an ad valorem tax exemption granted to institutions of purely public charity, see Ga. Const. of 1983, Art. VII, Sec. II, Par. IV, only to expand an existing exemption or create a new one, see Art. VII, Sec. II, Par. II (a) (1).

It is also clear that the only significant difference between the 2006 statute and its predecessor — and the only element of the new provision that *expanded* the existing tax exemption — was the deletion of the "primary" purpose qualifier present in the old subsection (d). Thus, while before the 2006 amendment real estate and buildings owned by all exempt institutions could not be "used for the *primary purpose* of securing an income thereon," the amendment allowed such property of purely public charities to be "used for the *purpose* of securing income." Importantly, the other restrictions on the use of charitable property to generate income — including the restrictions that prevent the income from being diverted to private

gain — remained unchanged, see OCGA § 48-5-41 (c) and the second sentence of (d) (1); the new provision also was limited to institutions of purely public charity that are federally tax-exempt, and it did not apply to tax-exempt institutions such as burial places, religious and educational institutions, and nonprofit hospitals.

Even with these remaining restrictions, the value of the new law to some charities is apparent. For example, a building owned and used by the Salvation Army or Goodwill Industries entirely as a thrift store — selling low-cost clothes and other goods — might now qualify for the property tax exemption (assuming all other restrictions are satisfied), whereas before 2007 only a building not used "primarily" for such income-generating activity would have qualified. Similarly, a historic building owned and preserved by a purely public charity but used more than incidentally as rental space for parties could now qualify for the tax exemption (again assuming all other restrictions are satisfied, including the return of all income generated to the operation of the charitable institution).

*4. The 2007 Amendment*

Just a few months after the 2006 amendment took effect, the General Assembly revised subparagraph (d) (2), effective May 23, 2007, to read as follows, with the deletions indicated by strike-out and the additions indicated by underlining:

> With respect to paragraph (4) of subsection (a) of this Code section [which provides the tax exemption for institutions of "purely public charity"], real estate or a buildings which are is owned by a charitable institution that is otherwise qualified as a purely public charity and that is exempt from taxation under Section 501(c)(3) of the federal Internal Revenue Code and which building is used by such charitable institution exclusively for the charitable purposes of such charitable institution, and not more than 15 acres of land on which such building is located, may be used for the purpose of securing income so long as such income is used exclusively for the operation of that charitable institution.

Ga. L. 2007, p. 341, §§ 1, 2.

I agree with the plurality that the 2007 amendment, enacted shortly after the 2006 amendment took effect, clarified rather than substantially modified the statute, with one exception that does not affect this case. See Plurality Op. at 383-384. The preamble to the 2007 amendment expresses that its purpose was "to *clarify* an ad valorem tax exemption for certain charitable institutions," Ga. L. 2007, p. 341 (emphasis supplied), and the 2007 amendment obviously did not have the effect of reverting the law to its pre-2006 state, as

the dissent would have it, since the 2007 amendment made minor revisions rather than simply repealing the statutory text added by the 2006 amendment. See Plurality Op. at 384.

The first two changes were plainly clarifications. By its express cross-reference to subsection (a) (4), the opening phrase of subparagraph (d) (2) limits what follows to "institutions of purely public charity"; the 2007 amendment simply confirms that the existing qualifications for such institutions are unchanged. One of those qualifications was that the property at issue must be "exclusively devoted to [the institution's] charitable pursuits," *York Rite*, 261 Ga. at 558; the 2007 amendment clarifies that this restriction also has not changed.

The only substantial change made by the 2007 amendment was to limit — to the building owned by the charity and not more than 15 acres on which the building sits — the extent of property that may be used primarily to generate income. The reason for this limitation is not apparent from the statute, but its effect is to prevent a charity from receiving the tax exemption if it owns a large amount of income-producing land. An amicus brief notes that between passage of the 2006 amendment and the 2007 amendment, a private timber company had donated 67,000 acres of timberland to its charitable foundation, which supports animal rights; the foundation then applied for about $700,000 in property tax exemptions in 18 counties. That, the Legislature may have decided, tips the balance too far.

*5. The Dissenting Opinion*

In my view, the dissent errs in interpreting the phrase in the current subparagraph (d) (2), "which building is used exclusively for the charitable purposes of such charitable institution," as a limit on the *type* of income-generating activity in which a purely public charity may engage. The dissent says that "the receipt of donations at [Nuci's] coffee bar, the sale of limited music supplies, and the rental of rehearsal space" may be "consistent with its [charitable] purpose of providing a safe haven for musicians and others to gather," but that "providing a venue for private birthday parties and wedding receptions cannot be viewed as advancing the Foundation's mission." Dissenting Op. at 401-402. The statutory text of OCGA § 48-5-41 and its predecessors, however, has never required a connection between the type of income-generating activity at issue and the charity's purpose, nor have this Court's previous cases relied on judicial views of whether a particular income-producing activity "advanc[es] the [charity's] mission."

Instead, as recognized by this Court more than a century ago, income-generating activity is not itself charitable; it is "too remote from the ultimate charitable object," *Mundy*, 104 Ga. at 297. Indeed, selling music supplies and renting rehearsal space is income-

generating activity commonly engaged in by property-tax-paying businesses. As recognized by this Court more than a half-century ago, however, when a charity uses its property to produce income that is then used exclusively for the charitable purposes of the charity, see OCGA § 48-5-41 (c) and (d), that income production is consistent with the charity's purposes, without examining the source of the income. See *Elder*, 205 Ga. at 492-493; *Church of God*, 216 Ga. at 662.

The General Assembly has put significant restrictions on such income production for other reasons — to limit unfair competition with tax-paying businesses and to ensure that income generated by charities is not diverted for private gain — but it has not restricted the type of income-producing activity in which the charity may engage. Nor has this Court — until today. Between 1946 and 2006, as I understand the law, a purely public charity might have a small gift shop or cafeteria in its building and still qualify for a tax exemption, even if the items sold had nothing to do with the charity's mission, so long as the income was all used for the charity's operations and the income-generating activity was not the primary purpose of the property. Only the last restriction was affected by the 2006 and 2007 amendments, and it was meant to be loosened. The dissent would turn the amendments on their head and make it more difficult for a charity to obtain a tax exemption than it was even under the 1946 law.

### 6. *The Plurality Opinion*

In my view, the plurality opinion reaches the correct result in this case, but its analysis of OCGA § 48-5-41 and our precedent is also flawed. The most conspicuous flaw is the plurality's contention that, to qualify for a tax exemption, a purely public charity's property still may not be used for the "primary purpose" of raising income. See Plurality Op. at 385-386. This position is simply contrary to the text of the 2006 amendment, which was unchanged in relevant part by the 2007 amendment. The phrase added to the beginning of subparagraph (d) (1) in 2006 *expressly excepts* from the "primary purpose" test of that provision — *"[e]xcept as otherwise provided in paragraph (2) of this subsection"* — the property of a purely private charity used to secure income as provided in subparagraph (d) (2). Requiring a charity to meet all the requirements of both (d) (1) and (d) (2) renders effectively meaningless that introductory phrase — and the revision of the charitable tax exemption endorsed by Georgia voters in the 2006 referendum and the General Assembly in the 2006 and 2007 statutory amendments. The plurality fails to explain how, when an express exception to a requirement is triggered, the requirement nevertheless applies.

In an attempt to read some other meaning into subparagraph (d)

(2), the plurality contends that it permits charities to exempt property that is used (as an "incidental" purpose) to produce income from "non-charitable activities," as opposed to "charitable activities," asserting that only the latter were permitted under the 1946 amendment. See Plurality Op. at 381, 385, 386. This approach resembles the dissent's focus on the nature of the income-producing activity, although the plurality would allow a charity to use its property for "non-charitable" activities so long as that use is not "primary." See id.

In this respect, the dichotomy offered by the plurality suffers from the same problems as the dissent's effort to determine which income-producing activities are "consistent" with the charity's purpose. The distinction has no foundation in the statutory text. OCGA § 48-5-41 (d) (2) nowhere refers to "charitable activities" or "non-charitable activities" in addressing the generation of income. Instead, the statute expressly provides, without limitation relating to the type of activity that produces income, that institutions of purely public charity may use their property "for the purpose of securing income so long as such income is used exclusively for the operation of that charity." Id. Virtually the same language existed in OCGA § 48-5-41 (c) (describing property "used for the purpose of producing . . . income") and (d) (describing property "used for the primary purpose of securing an income") before the recent amendments, and that language was unchanged by those amendments. Indeed, if the plurality were correct (which it is not) in claiming that only income-producing "charitable activities" were permitted between 1946 and 2006, then the use of the same language in the new subparagraph (d) (2) would be expected to mean the same thing. See *Smith v. Employers' Fire Ins. Co.*, 255 Ga. 596, 597 (340 SE2d 606) (1986) (holding that where the General Assembly enacts a statute using language that this Court has previously construed, the newly adopted statute will normally be construed to have same meaning).

In discussing its "charitable activities" versus "non-charitable activities" distinction, the plurality opinion cites several cases, but none of them use that terminology nor rely on that reasoning. Indeed, *Church of God* appears to refute the plurality's approach as well as the dissent's, as that case upheld, under the pre-2006 law, a tax exemption for a church building used in part as a restaurant selling food to members of the public, see 216 Ga. at 662 — but selling food is no more obviously a "charitable activity" than it is an activity obviously related to a church's purposes. Under our precedent and the tax exemption statute since 1946, however, using the charity's property to sell food and returning all the income produced to the charity to further its charitable purposes is "exclusively devot[ing]" that property to the institution's charitable pursuits.

*York Rite*, 261 Ga. at 558.

Like the dissent's approach, the plurality's approach is also amorphous, leaving it to judges after the fact to decide whether, in their opinion, the uses to which a charity devotes its property are "charitable" enough (or, in the dissent's view, "consistent" enough with the charity's mission). For example, the plurality describes the Foundation's "rental of property" as a "non-charitable" activity, Plurality Op. at 385, 386, but it is unclear why the Foundation's sale of music supplies (which the plurality apparently would deem a "charitable" activity) is any more "charitable." Instead of these uncertain distinctions, I believe the General Assembly has drawn a clearer line to guide both charities and taxing authorities.

Finally, the plurality notes the Board of Tax Assessor's argument that "allowing an institution that otherwise qualifies as a purely public charity to raise income from non-charitable activities, including rental of property, would lead to a greatly expanded tax exemption and would be vulnerable to abuse by commercial developers wishing to evade property tax." Plurality Op. at 385. The plurality responds that this policy concern is avoided because "all previous requirements for qualifying as a purely public charity under OCGA § 48-5-41 (a) (4), still apply, *including OCGA § 48-5-41 (d) (1)*." Plurality Op. at 385 (emphasis supplied). I believe the policy concern about commercial exploitation of the recent amendments is actually avoided because of the unchanged restrictions in the statute that have long prevented charities from diverting income to anything other than their purposes and operations, including distributing income to shareholders or other owners or former owners of the property, OCGA § 48-5-41 (c), (d) (1), (d) (2).

Contrary to the plurality's claim, however, the restrictions do *not* include the "primary purpose" requirement of OCGA § 48-5-41 (d) (1), which expressly excepts property to which (d) (2) applies. As discussed throughout this opinion, there is certainly a policy concern about allowing charities to produce income, free of property taxes, in competition with tax-paying businesses — but there is also a policy interest in allowing charities to produce income that will be used to further their benevolent purposes, thereby increasing the amount of charity in this state. Where to draw the line between these conflicting policies is a decision for the General Assembly and the people of Georgia. In 1878, the line was drawn strictly to preclude such competition; in 1946, the line was moved to allow income production but only as an incidental use of charitable property; in the recent referendum and amendments, the line was moved further — but only for buildings and limited acreage owned by purely private charities — to allow full use of the charity's property to secure income. It is not this Court's place to alter that policy balance.

*7. Application to the Foundation Property at Issue*

With the exception of its determination that the Nuci Phillips Foundation engages in "non-charitable" and "charitable" income-producing activities only incidentally, which is irrelevant in my view, I believe the plurality opinion correctly applies the law to the Foundation. See Plurality Op. at 386-387. The Nuci's Space property qualifies as an institution of "purely public charity" under OCGA § 48-5-41 (a) (4) and *York Rite*. The property owning Foundation is devoted entirely to the charitable pursuit of providing a safe gathering place for musicians and young people and aiding those with mental illnesses, including paying for mental health care. The Foundation's charitable pursuits are for the benefit of the public, available to all who seek help there, and particularly for " 'the classes for whose relief [the property] was intended.' " Plurality Op. at 386 (citation omitted).

Finally, the Foundation's "use of the property [is] exclusively devoted to those charitable pursuits." *York Rite*, 261 Ga. at 558. To be sure, the building is used to generate income in various ways, including the sale of musical supplies and the rental of rehearsal space and space for receptions and parties. But as the plurality recognizes, those activities "have the sole purpose of raising funds to be used for the organization's charitable services." Plurality Op. at 386. Thus, in accordance with the statute, the income is "used exclusively for the operation of [the] charitable institution," OCGA § 48-5-41 (d) (2), and none of it is diverted to shareholders or for other private gain, see OCGA § 48-5-41 (c). In my view, those activities are therefore authorized and do not preclude the property's tax exemption — and they would be even if the property were used for the primary purpose of securing such income. Consistent with the legislative policy judgments expressed in the 2006 and 2007 amendments, the Foundation's securing of such income, while it may create somewhat unfair competition for tax-paying Athens businesses providing similar goods and rental space, provides the Foundation with greater resources to advance its laudable charitable mission.

*8. The Implication of This Case*

It is important to recognize that the plurality opinion is narrower than my opinion, because it would impose an additional, "primary" purpose restriction on "non-charitable" and "charitable" income-producing activities engaged in by purely public charities seeking the ad valorem tax exemption under OCGA § 48-5-41. In other words, as I did in this case, any time the Justices in the plurality upheld a charity's tax exemption, I would as well, since I believe that the additional requirement does not exist. Accordingly, unless the Court changes course in a future case, the plurality opinion will be our effective precedent, governing the outcome of

future cases raising this issue. This is unfortunate, in my view, as it undermines the 2006 referendum and the 2006 and 2007 statutory amendments. I note, however, that the Court's decision is wholly one of statutory interpretation, so that the General Assembly may again amend OCGA § 48-5-41 (d) (2) to confirm, with clearer language, that it means what I think it already means — that a purely public charity may use its buildings and up to 15 surrounding acres to produce income that is used entirely for the operation of the charity.

For these reasons, I respectfully concur only in the judgment of the Court.

I am authorized to state that Justice Melton joins in this special concurrence.

HUNSTEIN, Chief Justice, dissenting.

Because the majority incorrectly analyzes the recent amendments to OCGA § 48-5-41 (d) and fails to rely upon the plain language of the current statute in reaching its result, I must respectfully dissent.

1. OCGA § 48-5-41 (a) (4) provides that "[a]ll institutions of purely public charity" are exempt from ad valorem property taxes in Georgia. This Court has held that

> [i]n determining whether property qualifies as an institution of "purely public charity" as set forth in OCGA § 48-5-41 (a) (4), three factors must be considered and must coexist. First, the owner must be an institution devoted entirely to charitable pursuits; second, the charitable pursuits of the owner must be for the benefit of the public; and third, the use of the property must be exclusively devoted to those charitable pursuits.

*York Rite Bodies of Freemasonry of Savannah v. Bd. of Equalization of Chatham County*, 261 Ga. 558 (2) (408 SE2d 699) (1991). Recent amendments to OCGA § 48-5-41 (d) have attempted to clarify the effect that income generated by property claimed to be exempt pursuant to OCGA § 48-5-41 (a) (4) has on the property's status as either taxable or tax exempt. In November 2006, the following statewide referendum question was posed:

> Shall the Act be approved which grants an exemption from ad valorem taxation on property owned by a charitable institution which generates income when that income is used exclusively for the operation of such charitable institution?

Ga. L. 2006, p. 377, § 2. Voter approval resulted in the amendment of OCGA § 48-5-41 (d) (the "2006 amendment"), effective January 1, 2007, to add the following as subsection (d) (2):

> With respect to [OCGA § 48-5-41 (a) (4)], real estate or buildings which are owned by a charitable institution that is exempt from taxation under Section 501 (c) (3) of the federal Internal Revenue Code and used by such charitable institution for the charitable purposes of such charitable institution may be used for the purpose of securing income so long as such income is used exclusively for the operation of that charitable institution.

Ga. L. 2006 at 377, § 1. However, OCGA § 48-5-41 (d) (2) was subsequently amended by the General Assembly (the "2007 amendment"), effective May 23, 2007, as follows:[1]

> With respect to [OCGA § 48-5-41 (a) (4)], a building which is owned by a charitable institution *that is otherwise qualified as a purely public charity and* that is exempt from taxation under Section 501 (c) (3) of the federal Internal Revenue Code and which building is used by such charitable institution *exclusively* for the charitable purposes of such charitable institution, and not more than 15 acres of land on which such building is located, may be used for the purpose of securing income so long as such income is used exclusively for the operation of that charitable institution.

(Emphasis supplied.) Ga. L. 2007, p. 341, §§ 1, 2. The emphasized changes are critical in that they plainly restrict the circumstances under which income-generating property will be exempt from taxation. They are also noteworthy in that they, in essence, encompass the provisions of *York Rite*, supra, 261 Ga. at 558 (2).[2]

The majority errs by addressing the separate 2006 and 2007 amendments to OCGA § 48-5-41 (d) as if they are one, Maj. Op. at 382, and by relying on the preamble to the 2007 amendment in an attempt to rebut the presumption that the addition of words therein

---

[1] A law reducing or repealing an exemption granted to institutions of purely public charity need only be approved by two-thirds of the members of each branch of the General Assembly. Ga. Const. of 1983, Art. VII, Sec. II, Par. IV.

[2] Specifically, the requirement that the charitable organization itself be qualified as a purely public charity tracks the language of the first two *York Rite* factors, i.e., that the property owner be an institution devoted entirely to charitable pursuits and that those charitable pursuits be for the benefit of the public. The requirement that the organization's property be used exclusively for its charitable purposes tracks that of the third *York Rite* factor.

was intended to effect a change in the law. Maj. Op. at 384; see *East Georgia Land and Dev. Co. v. Baker*, 286 Ga. 551, 553 (2) (690 SE2d 145) (2010) ("it is fundamental that the preamble or caption of an act is no part thereof and cannot control the plain meaning of the body of the act").

2. As this Court has recently reiterated, "where the language of a statute is plain and unambiguous, judicial construction is not only unnecessary but forbidden." (Citation and punctuation omitted.) *Anthony v. American General Financial Svcs.*, 287 Ga. 448, 450 (1) (a) (697 SE2d 166) (2010). See also *Telecom\*USA v. Collins*, 260 Ga. 362, 363-364 (1) (393 SE2d 235) (1990) ("golden rule" of statutory construction requires Court to follow literal language of statute unless it produces contradiction, absurdity or such an inconvenience as to insure that the legislature meant something else). The majority points to no ambiguity or conflict in the language of OCGA § 48-5-41.

The plain language of OCGA § 48-5-41 (d) (2) provides that property subject to the tax exemption for "institutions of purely public charity" may be used to secure income only if the following criteria are all met:

> (1) the property is owned by a Section 501 (c) (3) charitable institution that is otherwise qualified as a purely public charity;
> (2) the property is used by such charitable institution exclusively for the charitable purposes of such charitable institution; and
> (3) such income is used exclusively for the operation of that charitable institution.

Pretermitting whether the first and third criteria have been met here, I agree with the Court of Appeals that the Foundation has failed to show that the Nuçi's Space property is used exclusively for its charitable purposes. See *York Rite*, supra, 261 Ga. at 559 (2) (a) (facts of each case must be viewed as a whole and property owner has the burden of proving entitlement to tax exemption).

Although there may be only limited circumstances under which a given use of property is both income-generating and "for the charitable purposes of [the] charitable institution," OCGA § 48-5-41 (d) (2), I would recognize that the two need not be mutually exclusive. As this case demonstrates, Nuçi's Space obtains income from several sources that might be considered consistent with its purpose of providing a safe haven for musicians and others to gather, e.g., the receipt of donations at its coffee bar, the sale of limited music

supplies, and the rental of rehearsal space.[3] However, providing a venue for private birthday parties and wedding receptions cannot be viewed as advancing the Foundation's mission. I would reject the Foundation's argument that these events are consistent with its charitable purposes in that they serve to further "destigmatize" Nuçi's Space, as this stretches the definition of such purposes to include almost any use of the property. Because the Nuçi's Space property is not used by the Foundation exclusively for its charitable purposes, I would hold that the property is not entitled to exemption from ad valorem taxation and would affirm the decision of the Court of Appeals.

In briefs filed in support of the Foundation, amici argue that affirming the Court of Appeals would have "catastrophic" consequences for countless charitable organizations throughout Georgia, rendering many unable to continue their valuable work.[4] However, the Legislature in its wisdom chose to amend OCGA § 48-5-41 (d) (2) in 2007 to restrict the circumstances under which income-generating property will be tax exempt, and I would hold that the Court is "constrained by the language of the statute to reach this result." *Beneke v. Parker*, 285 Ga. 733, 735 (684 SE2d 243) (2009). Accordingly, I dissent.

I am authorized to state that Justices Benham and Hines join in this dissent.

DECIDED NOVEMBER 8, 2010 —
RECONSIDERATION DENIED DECEMBER 14, 2010.

*Timmons, Warnes & Anderson, James C. Warnes II*, for appellant.

*William C. Berryman, Jr., Amy S. Gellins*, for appellee.

---

[3] I disagree with the Court of Appeals to the extent it held that the rental of rehearsal space within the Nuçi's Space facility constitutes a use that is inconsistent with the charitable purposes of the Foundation. The Court relied in part on *Cobb County Bd. of Tax Assessors v. Marietta Educational Garden Center*, 239 Ga. App. 740 (2) (521 SE2d 892) (1999), which predates OCGA § 48-5-41 (d) (2), citing it for the proposition that the rental of a facility owned by a nonprofit organization precludes application of the ad valorem property tax exemption. *Athens-Clarke County Bd. of Tax Assessors v. Nuci Phillips Memorial Foundation*, 300 Ga. App. 754, 755 (686 SE2d 371) (2009). This reading of *Marietta Educational Garden Center* is overly broad and I would emphasize that the specific facts of each case must be analyzed.

[4] The record reflects that Nuçi's Space opened in September 2000 and filed its application for an exemption from ad valorem property taxes on February 28, 2007, after the January 1, 2007 effective date of the 2006 amendment to OCGA § 48-5-41 (d).

*Nelson, Mullins, Riley & Scarborough, Stanley S. Jones, Jr., Sarah A. Whalin*, amici curiae.