**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and DILLARD, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**March 27, 2013**

# In the Court of Appeals of Georgia

A12A2535. FIRST CONGREGATIONAL CHURCH v. FULTON COUNTY BOARD OF TAX ASSESSORS.

PHIPPS, Presiding Judge.

First Congregational Church appeals the superior court's summary judgment against it and in favor of the Fulton County Board of Tax Assessors. Specifically, the superior court ruled that certain of First Congregational's real estate (an income-producing parking lot) did not qualify for an exemption from ad valorem property taxation. We affirm.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled

to a judgment as a matter of law."[1] "In our de novo review of the grant [or denial] of a motion for summary judgment, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant."[2]

The material facts are uncontested. At all times relevant, First Congregational was organized as a tax-exempt entity within the meaning of Section 501 (c) (3) of the Internal Revenue Code. It provided religious and charitable services for its members and the community. First Congregational's sanctuary building, as well as its other properties, were situated within the same city block of downtown Atlanta.

By 1994, First Congregational owned two parking lots – a "main" lot and another lot located behind the building that housed the sanctuary. First Congregational determined it did not have enough parking spaces on its main lot, however. As a First Congregational board of trustees member[3] explained, a problem

---

[1] OCGA § 9-11-56 (c).

[2] *Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010) (citation and punctuation omitted); see *Norton v. Budget Rent A Car System*, 307 Ga. App. 501 (705 SE2d 305) (2010) ("We review the denial of summary judgment de novo, viewing the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.") (footnote omitted).

[3] According to this individual, the board of trustees was responsible for managing and safeguarding First Congregational's financial assets.

2

faced by "downtown churches . . . is that they become landlocked and they can't provide adequate parking, members were parking on the street and having to pay."

Thus, in May 1994, First Congregational purchased the land parcel at issue ("Property") for $250,000; it was located across the street from the sanctuary building. According to the board member, "[First Congregational] bought it for the express purpose of creating parking." Within four months of the purchase, First Congregational tore down the only building situated on the Property, created thereon a paved parking lot with sixty-four parking spaces, and entered into the first of a series of parking contracts with various private companies.

The contract relevant here was executed in 2004. First Congregational (as "Lessor") entered a "Parking Lot Lease Agreement" with Central Parking System of Georgia, Inc. (as "Lessee"), which covered the "Term" commencing January 3, 2005 and ending January 2, 2010. The Parking Lot Lease Agreement provided that "Lessor, for and in consideration of the rents . . . hereby leases and rents the [Property] to Lessee"; it provided that "Lessee shall use, occupy and operate the [Property] throughout the Term of this Lease for the parking of automobiles only."

As First Congregational points out, the Parking Lot Lease Agreement provided free parking for its parishioners, guests, and specified others as follows. One

provision stated: "Lessee's operation hours and days shall exclude Sundays, Thanksgiving and Christmas, during which times and days, the Lessor shall have exclusive use of the [Property]." Another provision stated: "Lessor shall have exclusive use of seven (7) reserved parking spaces adjacent to the Church for use by Church personnel, at no cost to Lessor."

Additionally, the Parking Lot Lease Agreement required the Lessee to "make every reasonable effort to provide at no cost to Lessor or its parishioners and guests" accommodations such as: (i) parking at "funerals and special occasions (weekends and evenings only for special occasions), upon giving Lessee one day's advance notice"; (ii) "occasional" night parking for "meetings and special events"; and (iii) "temporary" parking for "Lessor's contractors and service people from time to time." These free parking spaces were to be located, as the Parking Lot Lease Agreement specified, either "on the [Property] or at another comparable parking facility managed or owned by Lessee in the immediate vicinity of the [Property]."

Pursuant to the Parking Lot Lease Agreement, First Congregational received from Central Parking System a yearly amount of $90,000, payable in equal monthly installments of $7,500. In turn, the fees that Central Parking System charged its parking patrons fluctuated, depending on, for example, the availability of other

4

parking options for those conducting business in the area, whether the college in the

vicinity was in session, and whether special events were convened nearby. As the

board member recounted, First Congregational had always used a third-party

company in connection with operating the parking lot on its Property because

"parking revenues [are] very variable, it's up and down, and [First Congregational]

wanted a fixed amount . . . a fixed rate so [First Congregational] could count on that

and budget that income for its operations budget." First Congregational used the

monies paid to it under the Parking Lot Lease Agreement to support its services and

operations, including maintenance and upkeep of its buildings. In 2010, First

Congregational sold the Property for $1,225,000.

This case concerns tax year 2008.[4] First Congregational submitted an

application for exemption from ad valorem taxation for the Property, describing the

Property as a paved parking lot that was open to the public, and claiming that the

---

[4] Although First Congregational asserts in its brief that it applied for an exemption for tax years 2007, 2008, and 2009, the Board of Equalization's decision of record is for "TAX YEAR: 2008." Moreover, counsel for First Congregational acknowledged to the superior court that the ruling [from the Board of Equalization] "only addressed the 2008 tax appeal portion of it." And the superior court's order expressly so noted. See generally *Hart v. Groves*, 311 Ga. App. 587, 588 (1) (716 SE2d 631) (2011) ("This is a Court for correction of errors below, and, in the absence of a ruling by the trial court, this Court has nothing to review.") (citation and punctuation omitted).

Property was "used for charitable purposes." Regarding a question on whether "income or fees [were] received for the use of any part of this [P]roperty," First Congregational responded, "Yes, the Church leases the parking lot to an Operator and receives lease income as well as uses parking lot for its Services."

First Congregational's application was denied by the Fulton County Board of Tax Assessors. The Fulton County Board of Equalization likewise concluded that the Property did not qualify for tax exempt status in 2008. Thereafter appearing before the superior court, First Congregational and the Fulton County Board of Tax Assessors presented on cross-motions for summary judgment the question whether the Property qualified for tax-exempt status in 2008 under either of two paragraphs of OCGA § 48-5-41 (a),[5] as discussed below.

First Congregational claimed that the Property was exempt under: (i) OCGA § 48-5-41 (a) (2.1), pertaining to "places of religious worship,"[6] and/or (ii) OCGA § 48-5-41 (a) (4), pertaining to "institutions of purely public charity." Fulton County countered that First Congregation's use of the Property to secure income pursuant to the Parking Lot Lease Agreement with a third-party commercial entity disqualified

_____

[5] (Enumerating categories of property exempt from ad valorem property taxes).

[6] OCGA § 48-5-41 (a) (2.1) (A).

the Property from tax-exempt status. As Fulton County's representative deposed, "The property [was] being leased to a commercial entity for use in a commercial enterprise. . . . The property was operated as a commercial parking facility, commercial parking lot." Hence, Fulton County cited, inter alia, the restriction set forth in OCGA § 48-5-41 (d) (1), which states that, except as provided therein, the exemption provisions relied upon by First Congregational "shall not apply to real estate or buildings which are rented, leased, or otherwise used for the primary purpose of securing an income thereon."[7] And according to Fulton County, no exception was invoked.

The superior court agreed with Fulton County, determining that "First Congregational had leased the parking lot to a commercial enterprise for the primary purpose of securing income" and that, under OCGA § 48-5-41 (d), the use of the Property disqualified it from tax-exempt status (having also determined that no exception to that Code provision was invoked). Further, the superior court rejected First Congregational's alternate ground for summary judgment, which alleged that Fulton County had granted ad valorem tax exemptions to other churches for their

_____

[7] See OCGA § 48-5-41 (d) (1) (containing language "[e]xcept as otherwise provided in paragraph (2) of this subsection").

7

income-producing parking lots. The superior court thus granted the summary judgment motion filed by Fulton County and denied the cross-motion filed by First Congregational.

1. As an initial matter, we recognize that these general principles govern. "Taxation is the rule; exemption from taxation is the exception."[8] "[C]laims for exemption from taxation should generally be construed in favor of the State and against the taxpayers."[9] Therefore, "we strictly construe taxation statutes, and we will not find an exemption unless it is clear that the legislature intended such exemption."[10] "[T]he facts of each case must be viewed as a whole and all of the

---

[8] *Thomas v. Northeast Ga. Council, Inc., Boy Scouts of America*, 241 Ga. 291, 293 (244 SE2d 842) (1978) (citation and punctuation omitted); see *Leggett v. Macon Baptist Assoc.*, 232 Ga. 27, 28 (I) (205 SE2d 197) (1974).

[9] *Johnson v. Wormsloe Foundation*, 228 Ga. 722, 728 (2) (187 SE2d 682) (1972) (citation omitted); see *Fulton County Bd. of Tax Assessors v. Visiting Nurse Health System of Metropolitan Atlanta*, 243 Ga. App. 64, 65 (2) (532 SE2d 416) (2000).

[10] *Visiting Nurse Health System of Metropolitan Atlanta*, supra at 67 (3) (footnote omitted).

8

circumstances surrounding the institution [of purely public charity or the place of religious worship] must be considered."[11]

2. First Congregational contends that the superior court erred by concluding that neither the tax exemption for places of religious worship nor the tax exemption for institutions of purely public charity applied to its Property. First Congregational charges the superior court with misapplying the two paragraphs of OCGA § 48-5-41 (d), analyzed below.

(a) Paragraph (1) of that subsection pertinently provides:

Except as otherwise provided in paragraph (2) of this subsection, this Code section . . . *shall not apply to real estate or buildings which are rented, leased, or otherwise used for the primary purpose of securing an income thereon* and shall not apply to real estate or buildings which are not used for the operation of religious, educational, and charitable institutions.[12]

First Congregational cites evidence that it had purchased the Property for the purpose of creating a parking lot, and that after it converted the Property into a paved

---

[11] *Nuci Phillips Mem. Foundation v. Athens-Clarke County Bd. of Tax Assessors*, 288 Ga. 380, 385 (1) (703 SE2d 648) (2010) (citations and punctuation omitted) (plurality opinion).

[12] (Emphasis supplied.)

parking lot, it indeed used the Property for overflow parking for its parishioners and guests attending religious activities or obtaining charitable services. First Congregational acknowledges that it derived income from the Property by way of its contract with a third party, but points out that the income received by *it* (as opposed to whatever income was received by Central Parking System) was used to support its religious services and charitable pursuits. In light of these circumstances, First Congregational maintains that the Property's "primary" use was the provision of overflow parking, that income production of $90,000 yearly was an "incidental" use of its Property, and that under *Nuci Phillips Mem. Foundation v. Athens-Clarke County Bd. of Tax Assessors*,[13] its Property was entitled to the claimed tax exemptions.

In *Nuci Phillips Mem. Foundation*, the Supreme Court of Georgia explained that, under OCGA § 48-5-41 (d) (1),[14] whether a tax exemption was available for an income-producing property required a determination of the "primary purpose" of the

---

[13] Supra.

[14] (Expressly "excluding paragraph (1) of subsection (a) of this Code section").

10

property.[15] In that case, a foundation had applied for a tax exemption for its facility, a "building [that] provid[ed] a safe haven for musicians, or others, who [were] coping with mental illness."[16] At its facility, the foundation "rent[ed] out rehearsal space as well as space for private birthday parties and wedding receptions."[17] When the foundation sought an exemption as an institution of purely public charity, the taxing authority cited such income-producing activities as disqualifying the facility from tax-

---

[15] Id. at 383 (1) (citing paragraphs (1) and (2) of OCGA § 48-5-41 (d)). While expressly noting that "OCGA § 48-5-41 (d) (1) prefaces its restrictions with the phrase '[e]xcept as otherwise provided in [(d)] (2),'" *Nuci Phillips Mem. Foundation*, supra at 386-387 (2), the *Nuci Phillips Mem. Foundation* Court held that "for an institution to be granted a property tax exemption pursuant to OCGA § 48-5-41 (a) (4), it must satisfy [inter alia] OCGA § 48-5-41 . . . (d) (1) and (2)." *Nuci Phillips Mem. Foundation*, supra at 385 (2). The special concurrence, however, interpreted the noted prefacing phrase as expressly excepting from OCGA § 48-5-41 (d) (1)'s "primary purpose" test the property of a purely private charity used to secure income as provided in paragraph (d) (2). *Nuci Phillips Mem. Foundation*, supra at 395 (6), 398 (6) (Nahmias, J., specially concurring). But as the special concurrence acknowledged, "the plurality opinion will be [the Supreme Court's] effective precedent, governing the outcome of future cases raising this issue." *Nuci Phillips Mem. Foundation*, supra at 398-399 (8) (Nahmias, J., specially concurring). And at any rate, the facts of the instant case render OCGA § 48-5-41 (d) (2) unavailing to First Congregational. See Division 2 (b), infra.

[16] *Nuci Phillips Mem. Foundation*, supra at 385 (2).

[17] Id. at 380.

11

exempt status.[18] However, the Supreme Court determined, "The activities cited by the [taxing authority], such as rehearsal space and party rentals are an *incidental* use of the property."[19] The Court took into account that "[m]ost activities that take place on the property, such as the professional counseling assistance program, the provision of group meeting space for Survivors of Suicide and other groups, and the career resources board, are at the core of the organization's charitable purposes."[20] Given those circumstances, the Court concluded:

> The Foundation is not disqualified from the tax exemption under the restrictions in OCGA § 48-5-41 [ ] (d) (1). . . . Although the organization *periodically* rents out *part* of its building to third parties, the primary purpose of the building is not to raise income but to provide services for those seeking mental health assistance. Any income raised is incidental to the primary use of the property.[21]

Unlike the entity in *Nuci Phillips Mem. Foundation*, which "periodically rent[ed] out part of its building to third parties," and which entity *otherwise* used its

---

[18] See id. at 386 (2).

[19] Id. (emphasis supplied).

[20] Id.

[21] Id. (emphasis supplied).

12

property for activities that were "at the core of the organization's charitable purposes," First Congregational used almost the entirety of its Property (reserving exclusive use of only seven of the sixty-four parking spaces) approximately eighty-five percent of the time (six days of every week, save Thanksgiving Day and Christmas Day) to secure income pursuant to the Parking Lot Lease Agreement. As a result, most activities that took place on First Congregational's Property – essentially leasing its Property to a third-party, commercial entity for the designated purpose of the parking of automobiles for the general public – were patently *not* at the core of First Congregational's religious or charitable purposes. Such activities, unlike the ones at issue in *Nuci Phillips Mem. Foundation*, did not amount to an incidental use of the property. Because the circumstances underlying this case are inapposite to those underlying *Nuci Phillips Mem. Foundation*, First Congregational's reliance upon that case is misplaced.

First Congregational points out that, even for those six days of every week (Monday through Saturday, save Thanksgiving Day and Christmas Day), the Parking Lot Lease Agreement contained certain other provisions for accommodating free parking for its parishioners, guests, and other specified individuals. But that argument is unavailing. None of those cited provisions *required* Central Parking System to

provide free parking to any of those persons; Central Parking System was obligated only to "make every reasonable effort" to do so; and even if free parking could be provided, Central Parking System was not required to provide for such upon the Property; the Parking Lot Lease Agreement provided that "another comparable parking facility" would suffice. Additionally, the cited provisions contemplated only sporadic parking: at "funerals and special occasions," "occasional" night parking for "meetings and special events," and "temporary parking." What is more, First Congregational has cited no evidence regarding the extent to which its parishioners, guests, or other specified individuals parked free upon the Property on those six days (Monday through Saturday).

Given the circumstances here – in particular, the Parking Lot Lease Agreement and its impact upon First Congregational's use of the Property, we conclude that the Property was "real estate ... rented, leased, or otherwise used for the primary purpose of securing an income thereon," as contemplated by OCGA § 48-5-41 (d) (1).[22] There

---

[22] Accord *Ga. Osteopathic Hosp. v. Alford*, 217 Ga. 663, 668 (124 SE2d 402) (1962) (disallowing tax exemption, where hospital was "engaged principally for non-charitable purposes and apparently chiefly for the benefit of its staff"); *Cobb County Bd. of Tax Assessors v. Marietta Educ. Garden Center*, 239 Ga. App. 740, 744-745 (2) (521 SE2d 892) (1999) (disallowing tax exemption for the Center not because the Garden Center generated income by charging membership dues and renting its facilities for social events, using the income to offset the center's expenses, but rather

14

is no merit in First Congregational's contention that the superior court misapplied that paragraph.

(b) Nor is there any merit in First Congregation's contention that the superior court erred by finding inapplicable OCGA 48-5-41 (d) (2), the exception to OCGA § 48-5-41 (d) (1) that First Congregational claimed was invoked. OCGA § 48-5-41 (d) (2) states:

> With respect to paragraph (4) of subsection (a) of this Code section, a *building* which is owned by a charitable institution that is otherwise qualified as a purely public charity and that is exempt from taxation under Section 501(c)(3) of the federal Internal Revenue Code *and which*

---

because the Center provided substantial benefits, including free use of the Center, only to dues-paying member clubs). Cf. *Nuci Phillips Mem. Foundation*, supra at 387 (2); *Church of God of the Union Assembly v. City of Dalton*, 216 Ga. 659, 661-662 (119 SE2d 11) (1961) (explaining that the language "this exemption shall not apply to real estate or buildings other than those used for the operation of such institution and which is rented, leased or otherwise used for the primary purpose of securing an income thereon" is unambiguous language which means that "if the property is used primarily for . . . purposes other than the operation of the institution, it is not exempt from taxes," and thus concluding that a "restaurant, located in the main church building . . . , being a part of the church and used primarily for church purposes. . . comes with the exemption conferred by law"); *Elder v. Henrietta Egleston Hosp. for Children*, 205 Ga. 489 (53 SE2d 751) (1949) (allowing exemption to charitable hospital open to all patients, where 45 percent were not charged due to poverty, 24 percent were partly charged in light of their limited finances, and 31 percent of its patients were charged for all their medical care because they were financially able to pay).

*building* is used by such charitable institution exclusively for the charitable purposes of such charitable institution, *and* not more than 15 acres of *land on which such building is located*, may be used for the purpose of securing income so long as such income is used exclusively for the operation of that charitable institution.[23]

According to its plain and unambiguous terms, this paragraph limits "land" to that upon which a qualifying building is located.[24]

To be sure, the language of OCGA § 48-5-41 (d) (2) set forth above became effective as part of a 2007 amendment.[25] Prior to that amendment, the paragraph did not include the limiting language with respect to "land"; it pertinently provided instead:

With respect to paragraph (4) of subsection (a) of this Code section, *real estate or* buildings which are owned by a charitable institution that is exempt from taxation under Section 501 (c) (3) of the federal Internal Revenue Code and used by such charitable institution for the charitable purposes of such charitable institution may be used for the purpose of

---

[23] (Emphasis supplied.)

[24] See generally *Chase v. State*, 285 Ga. 693, 695 (2) (681 SE2d 116) (2009) ("[W]here the language of a statute is plain and unambiguous, judicial construction is not only unnecessary but forbidden.") (punctuation and footnote omitted).

[25] Ga. L. 2007, p. 341, § 1; see *Nuci Phillips Mem. Foundation*, supra at 382 (1).

securing income so long as such income is used exclusively for the operation of that charitable institution.[26]

Had the General Assembly intended for OCGA § 48-5-41 (d) (2), as amended in 2007, to apply to land other than that upon which a qualifying building is located, it would not have included the limiting language, which plainly and unambiguously states otherwise.[27]

Correctly, the superior court found that "the provision references a building and there is no building on the parcel/lot," then ruled that this exception to OCGA § 48-5-41 (d) (1) did not apply so as to exempt First Congregation's Property from ad valorem taxation.[28]

---

[26] Ga. L. 2006, pp. 376, 377, § 1 (emphasis supplied); see *Nuci Phillips Mem. Foundation*, supra at 382 (1).

[27] See *Nuci Phillips Mem. Foundation*, supra at 383 (1) (holding that OCGA § 48-5-41 (d) (2), as amended in 2007, contemplates "any building *and* not more than 15 acres of land owned by the institution") (emphasis supplied); see further *Nuci Phillips Mem. Foundation*, supra at 394 (4) (Nahmias, J., concurring specially) ("The only substantial change made by the 2007 amendment was to limit – to the building owned by the charity and not more than 15 acres on which the building sits – the extent of property that may be used primarily to generate income. The reason for this limitation is not apparent from the statute . . . .").

[28] See *Collins v. City of Dalton*, 261 Ga. 584, 585-586 (4) (a) (408 SE2d 106) (1991) ("Exemption, being the exception to the general rule, is not favored; but every exemption, to be valid, must be expressed in clear and unambiguous terms, and, when

17

The cases cited by First Congregational, *Marathon Investment Corp. v. Spinkston*[29] and *Elder v. Trustees of Atlanta Univ.*,[30] do not provide for an outcome in its favor. Those cases were decided prior to the 2007 amendment to OCGA § 48-5-41 (d) (2); moreover, the issues resolved therein did not concern income-producing real estate.[31]

(c) First Congregational complains that, if the superior court's summary judgment rulings are not reversed, "religious institutions will be forced to let their

---

found to exist, the enactment by which it is given will not be enlarged by construction, but, on the contrary, will be strictly construed.").

[29] 281 Ga. 888-889 (1) (644 SE2d 133) (2007) (finding that a land parcel which was "the site of the Church's auxiliary parking lot, not its actual sanctuary" was exempt as a place[ ] of religious worship," reasoning that "the proper use, occupancy and enjoyment of places of religious worship can require that accommodation be provided for the vehicles of the members of the attending congregation).

[30] 194 Ga. 716, 722 (2) (22 SE2d 515) (1942) ("The issue of tax exemptions should not depend upon whether or not a street separates some buildings from others, all a part of one institution and all used for college purposes.").

[31] *Marathon Investment Corp.*, supra at 889 (1); *Elder*, supra at 718, 723 (2) (concerning tax exemption that covered "'all buildings erected for and used as a college,' . . and provided that such property 'is not used for purposes of private or corporate profit or income'"; noting further that the land tracts at issue were either not income-producing or were tracts which the parties had "agreed to be subject to be taxed").

parking facilities sit fallow or be taxed, which would wastefully prohibit the public from parking on those lots during the work week."

However, as recognized above as governing principles: taxation is the rule; exemption from taxation is the exception; and we will not find an exemption unless it is clear that the legislature intended such exemption.[32] Moreover, "exemptions are made, not to favor the individual owners of property, but in the advancement of the interests of the whole people."[33] Whether and the extent to which an exemption applies are matters of policy judgment reserved for the legislature.[34]

The evidence showed that, by procuring the land parcel, then converting it into a parking lot, First Congregational increased available off-street, free parking spaces for its parishioners and guests. But the evidence further showed that First Congregation, determined to secure a fixed amount of income, placed its Property

---

[32] See Division 1, supra.

[33] *Collins*, supra at 585 (4) (a) (citation omitted).

[34] *Perdue v. Baker*, 277 Ga. 1, 14 (6) (586 SE2d 606) (2003) ("The core legislative function is the establishment of public policy through the enactment of laws.") (footnote omitted); *Commonwealth Investment Co. v. Frye*, 219 Ga. 498, 499 (134 SE2d 39) (1963) (holding that "the legislature, and not the courts, is empowered by the Constitution to decide public policy, and to implement that policy by enacting laws; and the courts are bound to follow such laws if constitutional").

under contract so that (during the time period relevant here) 90 percent of its Property would be used by a third-party commercial enterprise approximately 85 percent of the time to compete in the business of public paid parking in a congested area of downtown Atlanta. By doing so, First Congregational deliberately put its Property "in direct competition with private concerns which are engaged in the same business but enjoy no tax-exemption benefit. If our system of private enterprise is to survive, government must not by exempting competitors of free enterprise from taxes aid in destroying it by such unfair competition."[35] In balancing the competing policies at issue here, our General Assembly has determined that, except under circumstances not shown here, no exemption from ad valorem property taxation is permitted for places of religious worship or for institutions of purely public charity, if the "real estate . . . [is] rented, leased, or otherwise used for the primary purpose of securing an income thereon."[36] Because First Congregational's Property constituted such real estate,[37] First Congregational's complaint is unavailing.

---

[35] *United Hosp. Srvc. Assoc. v. Fulton County*, 216 Ga. 30, 34 (114 SE2d 524) (1960).

[36] OCGA § 48-5-41 (d) (1).

[37] See Division 2, supra.

20

3. First Congregational points to evidence that Fulton County has granted tax exemptions to other churches in the Atlanta area for their income-producing parking lots. Merely citing Ga. Const. Art. 7, Sec. 1, Para. III (a), it makes the conclusory assertion that the superior court's grant of summary judgment to Fulton County "[v]iolates the Constitutional Rule of Uniformity in Taxation."

First Congregational's assertion is unaccompanied by any meaningful legal argument.[38] Furthermore, the conclusory assertion fails to demonstrate how First Congregational was entitled to a ruling allowing for an exemption from ad valorem taxation where such is statutorily proscribed.[39] No reversible error has been demonstrated.[40]

---

[38] See Court of Appeals Rule 25.

[39] See Division 2, supra.

[40] See *Brooks v. Meriwether Mem. Hosp. Auth.*, 246 Ga. App. 14, 16 (2) (539 SE2d 518) (2000) (determining that appellant failed to preserve for appellate review her contention that she was deprived of due process, where she cited no authority other than the Due Process Clause, nor provided any real argument in support of her contention, except to repeatedly assert that she was being denied due process, even though she mentioned certain facts that suggested she was contending that statute was unconstitutional only as applied to her case); see generally *Chapman v. State*, 290 Ga. 631, 633 (2) (724 SE2d 391) (2012) (although appellant mentioned in summary fashion numerous instances of what he maintained supported his contention that he was denied a constitutional right, such claims were not pursued by specific legal argument and consequently were deemed to have been abandoned).

4. Given the foregoing, there is no merit in First Congregational's claim that it presented undisputed evidence entitling it to summary judgment.

*Judgment affirmed. Ellington, C. J., concurs. Dillard, J., concurs only in the judgment.*

A12A2535. FIRST CONGREGATIONAL CHURCH v. FULTON
COUNTY BOARD OF TAX ASSESSORS.

DILLARD, Judge, concurring in judgment only.

I concur in judgment only because I do not agree with all that is said in the majority opinion.[1] As such, the majority's opinion decides only the issues presented in the case *sub judice* and may not be cited by future parties as binding precedent. *See* Court of Appeals Rule 33 (a).

That said, I do agree with the majority that these cases are highly fact specific, and that the outcome in this case is largely driven by "the Parking Lot Lease Agreement and its impact upon First Congregational's use of the property." And while I believe the majority ultimately reaches the correct result, I fear that the language employed by the majority in its opinion might be misconstrued in subsequent cases to wrongfully deny charitable organizations tax exemptions that they are lawfully entitled to receive. We leave for another day, then, the question of whether a differently worded parking-lot lease agreement might satisfy the statutory requirements for tax exemption.

---

[1] While I do not specifically address each section of the majority's opinion, this concurrence in judgment only is intended to cover the entirety of the majority opinion.